BARNABAS C. HORTON

v.

JAMES HANDVIL et ux. et al.

The rule that one who conceals a fact material to the transaction, which is within his knowledge and which it is his duty to disclose, is guilty of actual fraud, applied to a transaction in which a mortgage was clandestinely put upon part of mortgaged premises by the defendant, between the time when he had agreed to convey the mortgaged premises to complainant in satisfaction of his mortgage thereon and the actual transfer, the existence of such new mortgage being concealed from complainant. The deed to the complainant was, by the decree, set aside, and his mortgage, though canceled, re-instated.

Bill for relief. On final hearing on pleadings and proofs.

*Mr. J. S. Salmon,* for complainant.

*Mr. J. H. Neighbour,* for defendants.

THE CHANCELLOR.

The complainant brings this suit to obtain relief from a fraudulent transaction, by which he was induced to accept from the defendants Handvil and wife a conveyance of mortgaged premises in satisfaction of the mortgage, and to deliver up the mortgage to them. Between the time of conveyance and the time of executing the deeds in pursuance thereof, the Handvils put upon part of the premises a mortgage to the defendant Amanda Brennon for $4,500, of which the complainant had no knowledge or information, and the existence whereof the Handvils concealed from him. Had he been aware that that mortgage had been given, he would have refused to carry out the agreement.

On the 24th of November, 1876, the complainant conveyed his farm, in the township of Chester, in Morris county, to Mrs. Handvil, for the consideration of $7,000. She paid nothing, but gave him a mortgage for the purchase-money upon the

farm and a house and lot owned by her, in Boonton, on which were a dwelling-house and shop, and which were subject to a mortgage for $500. The mortgage so given to the complainant was payable in two years from the 1st of April, 1877 (*i. e.*, on April 1st, 1879) with interest from April 1st, 1877, at seven per cent. per annum, payable semi-annually, according to the bond of the Handvils. The Handvils entered into possession of the farm soon after the deed was given and about the 1st of December following. They never paid either principal or interest, though often requested by the complainant, from time to time, to pay the interest due. In the latter part of February or early part of March, 1879, he, by letter, requested payment of the interest, and threatened to begin foreclosure proceedings if it were not paid. On the 11th of March, Handvil, in reply to the letter, called upon the complainant and told him that there was no use in proceeding to foreclose; that he would convey the property to him and thus spare him the expense. To this the complainant replied that he could find no fault with that, for he had had the records searched and had found nothing upon the Boonton lot except the $500 mortgage which was upon it when the complainant's mortgage was given, just as Handvil had told him (referring to the fact that when the complainant took his mortgage Handvil said to him that he would take his oath that the $500 mortgage was all the encumbrance that there was upon the property), and an old judgment of twenty years' standing. The complainant's lawyer had, at his request, searched the title with a view to foreclosure proceedings, about the 15th of February, and had communicated the result of the search to him a few days afterwards. About a week after the conversation just mentioned, a time was fixed for the parties to go to Dover to execute the conveyance to be given by the Handvils. The evening before the time so fixed, the complainant went to Handvil's house and told him that he would like to go to Boonton to see about the machinery which was in the shop; that he wanted to find out what he, Handvil, claimed to be movable property there. It was so arranged, and the next day they went to Boonton accordingly. The visit to Boonton was some time in the early

part of April.  Handvil furnished to Howell, the conveyancer (who is and then was the complainant's son-in-law), his deeds from which to prepare the conveyances from the Handvils to the complainant.  Howell drew two deeds, one for each property (he appears to have drawn two instead of one only because he supposed that two were requisite in such a case, one for each property), and went with them to the Handvils, at the farm, to get them executed.  They declined to sign them because he had not the bond and mortgage with him, which they insisted must be delivered up to them on the delivery of the deeds to the complainant.  A day was then fixed (it was May 1st following) on which they were to go to Howell's house and execute the deeds.  They went accordingly, and signed, acknowledged and delivered the deeds.  Handvil asked that the word "mortgage" in the covenants of the deed for the Boonton property should be erased before execution.  Howell says that he gave, as his reason, that Howell and the complainant "knew there was a mortgage upon the property."  Handvil insisted upon the surrender to him of the bond and mortgage, to which the complainant demurred; asking why he cared about the mortgage, seeing that it was upon the complainant's own property and saying that he did not see what difference it would make if the complainant retained it.  To which Handvil replied that it was customary to give up the papers when the matter was settled; that the complainant might sue upon the bond and give him trouble.  Thereupon, the complainant got the bond and mortgage and laid them upon the table.  He then went into another room to put away the deeds, and, when he returned, the Handvils had taken the bond and mortgage and left the house.  The complainant did not cancel either paper by tearing off the seals, and nothing was said about canceling the mortgage of record.  About a week afterwards, when the complainant was at Handvil's house (on the farm), he, at Handvil's request, signed a receipt, written upon the bond by Handvil, and dated April 1st, 1879, acknowledging that he had received upon the bond all dues up to date, in full of all demands.  He says he did not then tear off the seals of either the bond or mortgage, and did not see Handvil do so.

The seals have been torn from both, and the mortgage was canceled of record May 20th, 1879. There was no consideration in the transaction of the conveyance of the properties to the complainant, except the satisfaction of the bond and mortgage thereby. The Handvils had had the use of the farm for two years without making any payment to him therefor, and the property had depreciated in their hands. According to the testimony of disinterested witnesses, the Boonton property was not worth over $1,500 at that time, and, at a forced sale, would not have brought over about $750. It was mortgaged for $500. The complainant says it was not worth over $1,000 or $1,200 above that mortgage, and it appears that the very next day after he got the deed for it he offered to rent it for $3 a month, or to sell it for $1,000, including the amount due on the $500 mortgage. The Handvils, after the exchange of the papers, continued to live upon the farm under an arrangement between the complainant and Handvil, by which he was to work it "on shares." It was not until October, 1879, that the complainant was informed that in the latter part of March, 1879, and after the Handvils had agreed to convey the properties to him in satisfaction of his mortgage, they gave to their daughter, the defendant Amanda Brennon, a mortgage for $4,500 and interest upon the Boonton property. As before stated, it was on the 11th of March that Handvil offered to convey the two properties to the complainant to spare him the expense of a foreclosure, and the complainant accepted the proposition. About the 24th of that month Handvil and his wife executed a mortgage of the Boonton property, to his daughter, for $4,500, which mortgage was not recorded until the 26th of April following— after the deeds to the complainant had been drawn, and only six days before they were executed and delivered. Handvil swears that he informed the complainant of the existence of that mortgage before the deeds were executed, but the evidence is to the contrary. He says that he required that the word "mortgages" be struck out of the deed for the property (the word "mortgages" was not in the deed, but the word "mortgage" was) before he would execute it. But Howell swears that the reason

he gave for it was that they, Howell and the complainant, knew
that there was a mortgage upon the property. Howell, suppos-
ing that he referred to the $500 mortgage, struck out the word.
Handvil, who was sworn after Howell, says that what he said was
(and he says it was all that was said on the subject at that time),
that the complainant knew there were mortgages on the property.
He adds that there was not anything said as to what the mort-
gages were. He also says that before the giving of the deeds
he told the complainant about the $4,500. This is denied, and
the circumstances, as well as the testimony, conclusively show
the contrary. And here it may be remarked that the testimony
of Handvil on the subject of that mortgage is utterly unworthy
of belief. It abounds in the most palpable and apparently reck-
less contradictions, and in statements so incredible as to cast dis-
credit upon all his testimony. It seems highly probable that his
carefulness to have the word "mortgage" stricken out was due
to an intention thus to lay the foundation of a claim that the
complainant knew of the $4,500 mortgage. Nor is the claim
of the Handvils, that the deed of the Boonton property was
given merely as a mortgage to secure $300 due from them to the
complainant upon two promissory notes given by them to him,
established. It is quite evident that the complainant expected
to realize but little from that property when he took it, but it
was because of its then small value.

From August, 1879, to April, 1880, the house was rented for
fifty cents a week, and the shop was unoccupied until February,
1880. From May, 1879, to June, 1884, the rents for both house
and shop did not exceed $9 a month, and for 1880 and 1881
they were only $6 or $7 a month. In December, 1879, after
he had discovered the existence of the $4,500 mortgage, the
complainant wrote to Handvil saying that if the latter would
give him $1,000 he would give him a deed for the property and
give him the notes, and added, "Lawsuits cost money and I
have no money to spend, but if you don't do this I shall com-
mence a suit against you." Notwithstanding the testimony of
the Handvils to the contrary, the proof is that the complainant
has had possession of the property from the time of giving the

deeds. Mr. Salmon, the complainant's lawyer and agent, testifies that he received the keys before the 20th of May, 1879, and that he has had charge of the property ever since. It seems quite improbable that Handvil, who was so cautious in regard to the bond and mortgage held by the complainant, and insisted upon their being delivered to him before he would deliver the deeds, and was so careful, also, to have the word "mortgage" stricken out of the deed for the Boonton property before execution, would have been willing to convey that property (which he swears he considered to be worth, at that time, $10,000, and for which he says he was offered $11,000 in 1876) to the complainant in fee, merely as a mortgage to secure $300, without taking from him anything whatever to show that that was the true character of the conveyance. It is clear, from the evidence, that there was a fraudulent concealment of the existence of the $4,500 mortgage from the complainant, and that, had he known of it, he would not have accepted Handvil's offer to receive a conveyance of the mortgaged premises in satisfaction of his bond and mortgage. If one conceals a fact material to the transaction, which is within his knowledge and which it is his duty to disclose, he is guilty of actual fraud. *2 Pom. Eq.* § *901; Keen* v. *James, 12 Stew. Eq. 527.* I am by no means satisfied that the $4,500 mortgage was taken in good faith. The testimony leads to the contrary conclusion. There is great reason to believe that it was made and taken by collusion to defraud the complainant. The transaction, as the parties themselves state it, was a most unusual one and conducted in a most unusual manner, and the fact of the relationship of the parties does not account for its peculiar features. There is much reason to doubt whether Mrs. Brennon had the money which she claims to have lent to her father upon the mortgage. Her mortgage should be postponed to that of the complainant. When she took it, it was the third mortgage upon the property. The complainant's was the second and was duly recorded. It was not canceled of record until May 20th, 1879, nearly two months after her mortgage was given and nearly a month after the latter was recorded. When she took her mortgage, which was about March 24th, 1879, the

·complainant's mortgage had not been satisfied. At that time he had indeed accepted the proposition of the Handvils to receive a conveyance of the mortgaged premises in satisfaction of the bond and mortgage, but the agreement was not executed until May 1st, following. She says, and so does her father, that the whole of the $4,500 was advanced at once at the date of the mortgage, or a day or two afterwards. She, therefore, in nowise relied upon the cancellation of the complainant's mortgage. Justice requires that the complainant be restored to the position which he has lost through the defendants' fraud, and there is nothing in her position to forbid. The deeds from the Handvils to the complainant will be set aside and the bond and mortgage of the complainant re-instated and the cancellation of the record of the latter set aside. The complainant is entitled to costs.